# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**CANDICE MARIE TOWNSEND,**
**Plaintiff,**

**v.**                                    **Case No. 22-CV-165**

**KILOLO KIJAKAZI,**
**Acting Commissioner of the Social Security Administration,**
**Defendant.**

---

# DECISION AND ORDER

---

## 1. Introduction

Alleging she has been disabled since August 6, 2016 (Tr. 880), plaintiff Candice Townsend seeks supplemental security income and disability insurance benefits. Her date last insured was December 31, 2018. (Tr. 881.) After her application was denied initially (Tr. 206-25) and upon reconsideration (Tr. 229-49), a hearing was held before Administrative Law Judge (ALJ) Guila Parker on April 18, 2019 (Tr. 41-78). On May 7, 2019, the ALJ issued a written decision concluding that Townsend was not disabled. (Tr. 17-40.) After the Appeals Council denied Townsend's request for review on April 27, 2020 (Tr. 1-3), Townsend filed an action with this court. (Tr. 1005-06.)

On June 28, 2021, this court remanded Townsend's action to the agency pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings. (Tr. 1040-41.) On July 20, 2021, the Appeals Council issued a remand order. (Tr. 1042-48.) On October 27, 2021, ALJ Parker held a second hearing (Tr. 909-36) and, on November 18, 2021, Parker for a second time issued a written decision concluding that Townsend was not disabled (Tr. 876-908). Townsend filed this action on February 10, 2022. (ECF No. 1.) All parties have consented to the full jurisdiction of a magistrate judge (ECF Nos. 4, 6), and the matter is ready for resolution.

## 2. ALJ's Decision

In determining whether a person is disabled, an ALJ applies a five-step sequential evaluation process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At step one the ALJ determines whether the claimant has engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). The ALJ found that Townsend "has not engaged in substantial gainful activity since August 6, 2016, the alleged onset date." (Tr. 882.)

The analysis then proceeds to the second step, which is a consideration of whether the claimant has a medically determinable impairment or combination of impairments that is "severe." 20 C.F.R. §§ 404.1520(a)(4)(ii), (c), 416.920(a)(4)(ii), (c). An impairment is severe if it significantly limits a claimant's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1522(a), 416.922(a). The ALJ concluded that Townsend has the following severe impairments: degenerative disc disease of cervical and lumbar spine,

severed tendon of right little finger, depression, anxiety, and post-traumatic stress disorder (PTSD). (Tr. 882.)

At step three the ALJ is to determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (called "the listings"), 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1525, 416.920(a)(4)(iii), 416.925. If the impairment or impairments meets or medically equals the criteria of a listing and also meets the twelve-month durational requirement, 20 C.F.R. §§ 404.1509, 416.909, the claimant is disabled. 20 C.F.R. §§ 404.1520(d), 416.920(d). If the claimant's impairment or impairments is not of a severity to meet or medically equal the criteria set forth in a listing, the analysis proceeds to the next step. 20 C.F.R. §§ 404.1520(e), 416.920(e). The ALJ found that Townsend "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (Tr. 883.)

In between steps three and four the ALJ must determine the claimant's residual functional capacity (RFC), which is the most the claimant can do despite her impairments. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a). In making the RFC finding the ALJ must consider all of the claimant's impairments, including impairments that are not severe. 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2). In other words, "[t]he RFC assessment is a function-by-

3

function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." SSR 96-8p. The ALJ concluded that Townsend has the RFC

> to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), but she can never climb ladders, ropes, or scaffolds, and she can only occasionally stoop, crouch, or crawl. She cannot work at unprotected heights or operate dangerous moving machinery, and she can tolerate only occasional concentrated exposure to fumes, dusts, odors, gases, or similar pulmonary irritants. She can frequently, but not constantly, handle and finger with the right (dominant) upper extremity. She is able to understand and remember simple instructions consistent with unskilled work. She can maintain concentration, persistence, and pace sufficient to carry out simple tasks for two-hour intervals over an eight-hour day with customary scheduled breaks. She is limited to a low-stress job, defined as one that requires only occasional work-related decisions and only occasional changes in the work setting. She can tolerate occasional interaction with supervisors and coworkers. In addition, she is able to work in proximity to the public and have brief interaction with the public.

(Tr. 885-86.)

After determining the claimant's RFC, the ALJ at step four must determine whether the claimant has the RFC to perform the requirements of her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1560, 416.920(a)(4)(iv), 416.960. The ALJ concluded that Townsend "is unable to perform any past relevant work." (Tr. 898.)

The last step of the sequential evaluation process requires the ALJ to determine whether the claimant is able to do any other work, considering her RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1560(c), 416.920(a)(4)(v), 416.960(c). At this step the ALJ concluded that "there are jobs that exist in significant numbers in the national economy that [Townsend] can perform," including mail clerk

4

(Dictionary of Occupational Titles (DOT) Number 209.687-026); general office clerk (DOT Number 222.587-038); and order filler (DOT Number 221.587-018). (Tr. 899-900.) Therefore, she was not disabled.

### 3.    Standard of Review

The court's role in reviewing an ALJ's decision is limited. It must "uphold an ALJ's final decision if the correct legal standards were applied and supported with substantial evidence." *L.D.R. by Wagner v. Berryhill*, 920 F.3d 1146, 1152 (7th Cir. 2019) (citing 42 U.S.C. § 405(g)); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017) (quoting *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010)). "The court is not to 'reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner.'" *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) (quoting *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). "Where substantial evidence supports the ALJ's disability determination, [the court] must affirm the [ALJ's] decision even if 'reasonable minds could differ concerning whether [the claimant] is disabled.'" *L.D.R. by Wagner*, 920 F.3d at 1152 (quoting *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008)).

### 4. Analysis

Townsend argues that the ALJ erred in her assessment of certain medical opinions and that her step-five finding is not supported by substantial evidence.

#### 4.1. Opinion Evidence

Townsend first argues that a heightened standard of review—what she calls the "good explanation" standard—governs this court's review of the ALJ's explanations for rejecting or discounting the opinions of state agency consultative examiners. (ECF No. 19 at 11.) Townsend relies on *Beardsley v. Colvin*, 758 F.3d 834 (7th Cir. 2014), in which the court stated, "[R]ejecting or discounting the opinion of the agency's own examining physician that the claimant is disabled … can be expected to cause a reviewing court to take notice and await a *good explanation* for this unusual step." *Id.* at 839 (emphasis added) (citing *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003); 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1)). Because the claimant in *Beardsley* submitted her claim for benefits before March 27, 2017, the Code of Federal Regulations Title 20, Section 404.1527 governed the ALJ's review of the opinion evidence. § 404.1527 ("Evaluating opinion evidence for claims filed before March 27, 2017.").

Section 404.1527 instructed ALJs to "give more weight to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not." *Id.* § 404.1527(c)(1). This instruction informed the statement in *Beardsley* that a reviewing court ought to more closely scrutinize an ALJ's explanation for taking the "unusual step" of

"rejecting or discounting the opinion of the agency's own examining physician" than an explanation for rejecting or discounting the opinion of a physician who had not personally examined the claimant. *Beardsley*, 758 F.3d at 839 (citing § 404.1527(c)(1)).

But Townsend filed her claim after March 27, 2017. (Tr. 20.) Therefore, the Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, *revised* 82 Fed. Reg. 15132—including the altered criteria for analyzing opinion evidence, 20 C.F.R. § 1520c—apply to her claim. *See id.* § 1520c ("How we consider and articulate medical opinions and prior administrative medical findings for claims filed on or after March 27, 2017."). Section 1520c(a) provides that the agency "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." *Id.* § 404.1520c(a). Rather, an ALJ must assess all medical opinions in terms of their persuasiveness, paying particular attention to how well the experts support their opinions, how consistent the opinions are with the record, the relationship between the expert and the claimant, the expert's specialization and expertise, and any other particularly relevant factors. *Id.* § 404.1520c(c). Section 404.1520c(b) provides that, while an ALJ must consider all of these factors, she need only explain how she considered supportability and consistency. *Id.* § 404.1520c(b).

Despite § 404.1520c(a)'s unambiguous command that ALJs shall "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)

or prior administrative medical finding(s)," Townsend argues that this court ought to hold the ALJ's explanations for rejecting or discounting the opinions of the agency's examining physicians to a more stringent standard. (ECF No. 35 at 1-4.) But she fails to direct this court's attention to a case in which a reviewing court applied a heightened standard to an ALJ's explanations for rejecting examining expert opinions where the claimant filed her application for benefits after March 27, 2017. (ECF Nos. 19, 35.) As such, the court will review the ALJ's explanations for rejecting the expert opinions according to § 404.1520c—namely, by examining whether the ALJ, in evaluating the persuasiveness of the experts' opinions, complied with her duty to articulate how the two most important factors (supportability and consistency) informed her decision to discount or reject the opinions. *See* 20 C.F.R. § 404.1520c.

### 4.1.1. Dr. Mark Pushkash

Psychological consultative examiner Dr. Mark Pushkash opined that Townsend's "ability to concentrate and persist on tasks in a work setting is likely to be moderately to severely impaired due to the interfering effects of anxiety." (Tr. 461.) The ALJ discounted this aspect of Pushkash's opinion, finding that Townsend, at most, exhibited only moderate limitations in her ability to concentrate/persist. (Tr. 894-95.)

#### 4.1.1.1.Supportability

In explaining how ALJ's are to assess an opinion's "supportability," the regulations provide, "The more relevant the objective medical evidence and supporting

explanations presented by a medical source are to support his or her medical opinion(s) …, the more persuasive the medical opinions … will be." 20 C.F.R. § 404.1520c(1). The ALJ explained that Pushkash's opinion as to the interfering effects of Townsend's anxiety was "not supported by Dr. Pushkash's own examination of [Townsend]." (Tr. 894.) While the ALJ "recognize[d] that Dr. Pushkash's examination revealed some abnormalities, including agitated demeanor, distractible behavior, anxious mood, depressed affect, and below average intellectual abilities[]"—all of which tended to support Pushkash's opinion—"his examination also revealed that [Townsend] was alert and fully oriented, was able to fully participate in the examination and complete all tasks asked of her, correctly performed a subtraction question, demonstrated intact abstract reasoning, and was able to accurately complete a serial 3's task, albeit slowly." (Tr. 894-95.) Thus, the ALJ found that "Dr. Pushkash's overall examination reveals some concentration deficits, but none that rise to the severe level." (Tr. 895.)

Townsend contends that the ALJ impermissibly "played doctor" when concluding that "Dr. Pushkash's finding of up to severe limitations in the ability to concentrate/persist is not supported by [his] own examination." (ECF No. 19 at 17 (citing Tr. 895).) Townsend relies on *Lambert v. Berryhill*, 896 F.3d 768, 774 (7th Cir. 2018), where the court found that the ALJ had "played doctor" when discounting the opinion of the claimant's treating neurosurgeon based on the ALJ's own lay opinion that the "x-rays revealed good fusion and good position of the [sacroiliac] joint." The court concluded

that the ALJ had failed to adhere to the principle that "ALJs must rely on expert opinions instead of determining the significance of particular medical findings themselves." *Id.* (citing *Meuser v. Colvin*, 838 F.3d 905, 911 (7th Cir. 2016); *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016); *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014)).

Rather than credit Pushkash's opinion based on the results of a psychological examination Pushkash himself conducted, the ALJ instead decided that Pushkash's "finding of up to severe limitations in the ability to concentrate/persist" was not supported by Pushkash's own observations taken during his examination of Townsend. In other words, the ALJ decided not to defer to Pushkash's expert opinion on the results of the examination he conducted, but instead determined the significance of those findings herself.

The Commissioner contends that the ALJ, in "finding Dr. Pushkash's opinion unsupported by relatively unremarkable findings his own exam revealed[,]" was not playing doctor but was merely "following the regulations … [, which] require an ALJ to consider how well supported an opinion is." (ECF No. 29 at 16 (citing 20 C.F.R. § 404.1520c(c)(1)).) She points out that "an ALJ does not [play doctor] when she evaluates whether a medical opinion is supported or consistent with the record" and argues that that is what the ALJ did here, citing for support two cases where "[t]he Seventh Circuit … affirmed ALJ decisions that discount[ed] medical opinions based on a conflict with

mental status examinations." (ECF No. 29 at 16 (citing *Pavlicek v. Saul*, 994 F.3d 777, 781-82 (7th Cir. 2021); *Recha v. Saul*, 843 F. App'x 1, 5 (7th Cir. 2021)).)

The Commissioner is correct—an ALJ does not play doctor when she evaluates whether a medical opinion is supported by or consistent with other evidence in the record. Indeed, as the Commissioner argues, that is precisely what the regulations require of an ALJ when assessing a medical opinion's persuasiveness. *See* § 404.1520c. But an ALJ *does* play doctor when she, rather than "rely on expert opinions[,] … determines the significance of particular medical findings [herself]." *Lambert*, 896 F.3d at 774 (citing *Meuser*, 838 F.3d at 911; *Stage*, 812 F.3d at 1125; *Goins*, 764 F.3d at 680).

The cases cited by the Commissioner help to illustrate this distinction. In *Pavlicek*, the court upheld an ALJ's decision to reject a treating physician's opinion where the ALJ found the opinion inconsistent with over two-years' worth of treatment notes from the same treating physician. *Pavlicek*, 994 F.3d at 781-82. By contrast, the ALJ here rejected Pushkash's opinion not because it was inconsistent with his own treatment notes but because the ALJ interpreted the results from Pushkash's examination differently than Pushkash did. (Tr. 894-95.)

Similarly, in *Recha*, the court upheld an ALJ's decision to give little weight to a treating physician's opinion where much of the opinion was contradicted by the physician's treatment notes from prior treatment sessions that "almost universally indicated" contrary findings. *Recha*, 843 F. App'x at 5. By contrast, an ALJ plays doctor

Case 2:22-cv-00165-WED   Filed 04/20/23   Page 11 of 31   Document 39

when she rejects an expert's opinion because *she* (the ALJ) has a different opinion on what the results of the expert's examination show—which is what the ALJ did here. In short, the ALJ impermissibly played doctor when determining that Pushkash's opinion was not supported by his own examination results.

The Commissioner argues that, "even if the ALJ erred in evaluating Dr. Pushkash's opinion, [Townsend] fails to show that any error was harmful." (ECF No. 29 at 16.) An ALJ's error in discounting an expert's opinion is harmless if the ALJ's decision was otherwise overwhelmingly supported by the record, making remand for the sake of reassessing the opinion a waste of time. *See Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010). But to avoid the harmless error doctrine becoming "an exercise in rationalizing the ALJ's decision," the Seventh Circuit has instructed courts to construe the doctrine narrowly. *See McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011).

The ALJ's error of rejecting Pushkash's opinion on the ground that it was not supported by his examination results was not harmless. Other evidence—including from Pushkash's own examination—tends to corroborate Pushkash's opinion that Townsend's "ability to concentrate and persist on tasks in a work setting is likely to be moderately to severely impaired due to the interfering effects of anxiety." (Tr. 54, 59, 467, 609.) Therefore, the court cannot conclude that remanding this case to the ALJ to reassess the supportability of Pushkash's opinion would again result in her deciding to reject it. As such, remand is necessary so that the ALJ can reassess the supportability of Pushkash's

Case 2:22-cv-00165-WED   Filed 04/20/23   Page 12 of 31   Document 39

opinion that Townsend's "ability to concentrate and persist on tasks in a work setting is likely to be moderately to severely impaired due to the interfering effects of anxiety."

### 4.1.1.2. Consistency

In explaining how an ALJ is to assess an opinion's "consistency," the regulations provide, "The more consistent a medical opinion(s) … is with the evidence from other medical and nonmedical sources …, the more persuasive the medical opinion(s) … will be." 20 C.F.R. § 404.1520c(c)(2). Addressing this factor, the ALJ explained that Pushkash's finding of up to a severe limitation in Townsend's ability to concentrate was "not consistent with … [Townsend's] mental status examinations, which also did not reveal severe concentration problems." (Tr. 895.)

The treatment records, which document the referred-to mental status examinations, span October 2016 through April 2018 and include descriptions of Townsend as alert, cooperative, engaged, coherent, correctly oriented, relaxed, presenting with intact memory and appropriate mood and affect, easily able to perform serial 7s, and able to describe current events and interpret proverbs aptly. (Tr. 464, 467-68, 503-04, 848-50.) The treatment records also include descriptions of Townsend as agitated, hyperactive, dealing with auditory hallucinations, and with violent and phobic thoughts and low self-esteem. (Tr. 464.)

Citing *Grzegorski v. Saul*, No. 19-CV-1661, 2020 WL 5047555, at *7 (E.D. Wis. Aug. 26, 2020), Townsend argues that "even *if* these records could be read as allowing for

inferences into [her] concentration"—which she contends they cannot—"they do nothing more than provide snapshots of [her] condition in a therapeutic environment." (ECF No. 19 at 17 (emphasis in original).) Therefore, they provide little insight into how her anxiety may impact her concentration in a work setting. In *Grzegorski* the court found that the ALJ erred in relying on treatment notes documenting mild symptoms as a reason for rejecting expert opinions on the impact of a claimant's bipolar disorder on her ability to concentrate. *Id.* Because the claimant "suffer[ed] from bipolar disorder," which is a disease with "fluctuat[ing] … symptoms," it made little sense for the ALJ to discount the expert opinions merely because "snapshot" treatment notes taken from brief treatment visits documented "normal behavior." *Id.*

The Commissioner argues that, while Townsend disagrees with the ALJ's conclusion that her treatment records are inconsistent with Pushkash's opinion, she "offers up no evidence from these treatment records of the 'severe concentration problems' they *did*, allegedly, show." (ECF No. 29 at 15 (emphasis in original).) The Commissioner further argues that Townsend's "snapshot" argument is "meritless, as an ALJ must consider … such clinical findings, as well as observations and descriptions of how a claimant functions during examinations or therapy." (ECF No. 29 at 15.)

The ALJ reasonably found that treatment records with descriptions of Townsend as cooperative, engaged, and able to complete the various tasks assigned to her (Tr. 464, 467-68, 503-04, 848-50) were inconsistent with Pushkash's opinion that Townsend's

14

"ability to concentrate and persist on tasks in a work setting is likely to be moderately to severely impaired due to interfering effects of her anxiety" (Tr. 461). While it is true that those records include descriptions of Townsend that could be construed as consistent with a severe concentration limitation (*e.g.*, Townsend appeared "agitated," "angry," "anxious," and with "violent, phobi[c]" thought content), it is not this court's role to reweigh such evidence. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012) ("We do not reweigh evidence or substitute our own judgment for that of the ALJ[.]"). As such, the court cannot say that the ALJ erred by concluding that Pushkash's opinion was inconsistent with the treatment records.

While the symptoms associated with Townsend's PTSD, anxiety, and depression may fluctuate, she has not directed this court to any treatment records mentioning concentration/persistence deficits. Thus, her treatment records are not properly characterized as unhelpful "snapshots," but, in fact, constitute "evidence from other medical sources," which an ALJ is instructed to weigh when assessing an opinion's persuasiveness. Even if the court accepted Townsend's proposition that treatment notes taken in a "therapeutic environment" offer little insight into how she might grapple with "workplace pressures," it cannot conclude that the ALJ was obligated to discount such evidence for that reason. *See Freeman United Coal Mining Co. v. Benefits Rev. Bd., U.S. Dep't of Labor*, 909 F.2d 193, 195 (7th Cir. 1990) ("It is for the ALJ to weigh conflicting evidence and draw inferences from it; a reviewing court may not draw contrary inferences merely

because they appear more reasonable[.]"). As such, it was not error for the ALJ to discount Pushkash's opinion based on an inconsistency with Townsend's treatment records. The ALJ need not assess whether Pushkash's opinion is consistent with other evidence in the record on remand.

### 4.1.2. Dr. Robert Verwert

Psychological consultative examiner Dr. Robert Verwert opined that Townsend "appears to have the ability to understand and remember information," but that "applying it and interacting with others can be a problem given her underlying anger, inattention, and suspicion of others." He concluded that her "concentration ... suffers and she cannot maintain the pace needed." (Tr. 609.)

The ALJ found Verwert's "assessment to be partially persuasive." (Tr. 895.) While she "recognized that Dr. Verwert's examination demonstrated significant problems in [her] ability to concentrate and maintain pace" (Tr. 895), the ALJ found the persuasiveness of these observations weakened by other evidence in the record, including Townsend's "activities of daily living, her irregular pursuit of mental health treatment, and her overall performance at Dr. Pushkash's consultative examination." (Tr. 895.)

Townsend first argues that the ALJ erred in finding that her ability to perform certain daily activities was a reason to discount Verwert's observations regarding her concentration/pace abilities. (ECF No. 19 at 12 (citing Tr. 895).) "The ability to perform

sporadic activity on a voluntary basis not subject to competitive standards does not show an ability to perform comparable activities on a full-time basis." (ECF No. 19 at 12.)

The ALJ did not specify which of Townsend's daily activities were inconsistent with Verwert's opinion about her ability to concentrate and maintain pace. Earlier in her decision the ALJ remarked that Townsend's ability to run errands, complete paperwork/job applications, read, help her teenage daughter with schoolwork, maintain her hygiene and medical care, cook basic meals, and shop "suggest that [Townsend] retains greater mental and physical capacities than she has alleged." (Tr. 892.) But the ALJ did not link any of these daily activities to her assessment of Verwert's opinion, nor did she say that Townsend's ability to perform any of these activities was inconsistent with her claims regarding her ability to maintain concentration, pace, or both. (Tr. 895.) She also failed to explain how any of these activities informed her opinion about Townsend's ability to perform in the workforce. (Tr. 895.)

Without further explanation, it is not clear *which* of Townsend's daily activities the ALJ found to be inconsistent with Verwert's opinion, let alone how being able to complete any one of the listed daily activities undermines his opinion concerning Townsend's ability to maintain concentration/pace in a work setting.

As to Townsend's "irregular pursuit of mental health treatment," infrequent treatment can support an adverse inference about the severity of a claimant's impairments absent a good explanation. However, "the ALJ 'must not draw any

inferences' about a claimant's condition from [a lack of treatment] unless the ALJ has explored the claimant's explanations as to the lack of medical care." *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008); *see also Beardsley*, 758 F.3d at 840 (remanding to agency where the ALJ "made no evident attempt to determine why [the claimant] elected" to forgo certain medical treatment).

At the administrative hearings the ALJ did not ask Townsend for an explanation about her lack of mental health treatment. (Tr. 41-78, 909-36.) Nor did she inquire as to whether Townsend's failure to seek treatment could be a byproduct of Townsend's impairments. (Tr. 41-78, 909-36.) It was error for the ALJ to conclude that Townsend's "irregular pursuit of treatment" undercut Verwert's opinion without asking Townsend why there appeared to be a lack of mental health treatment in her record.

As for the ALJ's conclusion that Townsend's "overall performance at Dr. Pushkash's consultative examination" was inconsistent with Verwert's "finding of significant problems in [her] ability to concentrate and maintain pace[,]" Townsend contends that both Pushkash and Verwert "flagged ... significant difficulties in social interaction as well as concentration and pace." (ECF No. 19 at 14 (citing Tr. 609, 461).) Townsend further argues that any differences in the consulting examiners' notes are explained by the fact that the examiners asked her different questions. For example, while Verwert asked her "to perform serial subtractions by seven (she couldn't), ... Pushkash merely asked her to count by threes to twenty," noting that she was only able to perform

the task "slowly" and with "obvious" concentration problems. (ECF No. 19 at 14 (citing Tr. 460, 608).) The fact that the assessments were different explains why Townsend was able to perform aspects of Pushkash's assessment—albeit with some difficulty—but was unable to perform most of Verwert's.

Townsend essentially asks this court to reweigh Verwert's and Pushkash's opinions to determine whether they are, in fact, consistent with one another. But the ALJ—not this court—is tasked with weighing the evidence. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). While this court may have assessed Verwert's and Pushkash's examinations differently—and perhaps may have found that the results of the two examinations were more consistent with one another than inconsistent—the court cannot say that the ALJ's determination was not supported by substantial evidence. Although the differences in the examinations might explain why Townsend was able to perform Pushkash's assigned tasks but not Verwert's, to conclude that the ALJ failed to account for these differences would amount to this court substituting its judgment for that of the ALJ. And it would be error for the court to do so. *See Sanders v. Colvin*, 600 F. App'x 469, 470 (7th Cir. 2015) ("[A]n ALJ's job is to weigh conflicting evidence, and the loser in such a process is bound to believe that the finder of fact should have been more favorable to his cause. The substantial-evidence standard, however, asks whether the administrative decision is rationally supported, not whether it is correct (in the sense that federal judges would have reached the same conclusions on the same record).").

The Commissioner argues—as she did with Pushkash's opinion—that "even if the ALJ erred in evaluating Dr. Verwert's opinion, any error was harmless." (ECF No. 29 at 19.) The Commissioner points to evidence in the record tending to corroborate the ALJ's decision to discount Verwert's opinion. (ECF No. 29 at 19 (citing Tr. 93, 149, 469, 472, 476, 480, 484, 488, 496, 500, 504, 846, 850, 854, 858, 862, 866, 870, 874).) But the fact that there is evidence tending to support the ALJ's conclusion does not mean that her vague reference to Townsend's daily activities and her reliance on a lack of mental health treatment as reasons for discounting Verwert's opinion was harmless.

On remand the ALJ must explain which of Townsend's daily activities are inconsistent with Verwert's opinion about Townsend's ability to maintain concentration/pace in a work setting, and how she reached that conclusion. Additionally, on remand the ALJ must inquire into Townsend's reasons for her lack of mental health treatment if she is to again conclude that a lack of such treatment conflicts with Verwert's opinion about her concentration/pace abilities.

### 4.1.3. Dr. Jason Kocina

Psychological consultant Dr. Kocina opined that Townsend "would have occasional trouble maintaining a normal work schedule and arriving on time to work." (Tr. 91.) The ALJ rejected this opinion, in part because she found it inconsistent with evidence "indicat[ing] that … [Townsend] ha[d] pursued only sporadic mental health treatment." (Tr. 896.)

While Townsend lumps Dr. Kocina's opinion in with Drs. Pushkash's and Verwert's as an opinion that the ALJ erred in assessing, her references to Kocina's opinion are buried within larger points directed toward Pushkash's and Verwert's more consequential opinions. For example, when arguing that Verwert's and Pushkash's opinions are in fact consistent with one another—and that the ALJ glossed over the consistencies by "inventing" inconsistencies in order to discount Verwert's opinion—Townsend points out that Dr. Kocina found both Pushkash's and Verwert's opinions persuasive and that this is further evidence of their consistency. (ECF No. 19 at 16.) While this point speaks to the ALJ's analysis of Verwert's opinion, it says nothing about how the ALJ's assessment of Kocina's opinion went awry.

Townsend also faults the ALJ for using what the ALJ termed her "sporadic [pursuit of] mental health treatment" (ECF No. 19 at 19 (citing Tr. 896)) as a reason for dismissing Kocina's "predict[ion] that [she] would … be late to work on an 'occasional' basis due to her psychological symptoms" (ECF No. 19 at 11 (citing Tr. 11)). While an ALJ must inquire about a claimant's lack of treatment before drawing an adverse inference from the lack of treatment, Townsend does not explain the significance of Kocina's equivocal opinion that her psychological symptoms may cause "occasional" tardiness. Townsend states, "Under the Commissioner's definition of 'occasional' that would mean up to once every three workdays." (ECF No. 19 at 11 (citing SSR 83-10).) But she does not explain why remand is necessary for reevaluation of the equivocal, one-off opinion that she might be tardy "up

to once every three workdays." (ECF Nos. 19, 35.) Because Townsend's arguments relating to Kocina's opinions are undeveloped, the ALJ need not reassess his opinions on remand. *Cf. Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001) ("We have held time and again that perfunctory and undeveloped arguments … are waived." (quoting *United States v. Andreas*, 150 F.3d 766, 769 (7th Cir. 1998)).

### 4.2. Step-Five Finding

At step five the agency bears the burden of demonstrating that there are significant numbers of jobs in the national economy for someone with the claimant's abilities and limitations. *See* 20 C.F.R. § 416.960(c)(2). In estimating the number of jobs available to the claimant, "ALJs commonly rely on the testimony of vocational experts—professionals with experience in job placement and knowledge of working conditions." *See Ruenger v. Kijakazi*, 23 F.4th 760, 761 (7th Cir. 2022) (citing *Biestek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019); 20 C.F.R. § 416.966(e)).

Prior to the hearing Townsend's counsel submitted a motion "request[ing] the issuance of a Subpoena Duces Tecum to [the VE] to ensure that [he] produces at the hearing certain documents upon which [he] may rely in forming opinions during the course of the hearing." (Tr. 1135.) In the motion Townsend's counsel preemptively "object[ed] to the VE testifying about the number of jobs that may exist in the labor market unless [he] produces valid, reliable data to support [his] testimony … [and] a foundation demonstrating a validated scientific methodology which supports [his]

opinion." (Tr. 1139.) Townsend's counsel attached to the motion an appendix outlining certain critiques of the *Occupational Employment Quarterly* (OEQ) and its methodology for producing job estimates—commonly referred to as the "equal distribution method." (Tr. 1144-45.)

At Townsend's hearing the vocational expert (VE) testified that an individual with Townsend's vocational background and RFC could perform the work of a mail clerk, general office clerk, and order filler, and that there are approximately 390,195 such jobs available in the national economy. (Tr. 899, 930.) The VE explained that he had consulted the OEQ to estimate how many of each job was currently available in the national economy. (Tr. 934.) When asked by Townsend's counsel whether "OEQ … [had] change[d] its method for developing [job-number estimates] in the last five years," the VE explained that OEQ has used a "similar algorithm" for the past five years. (Tr. 934.) The VE conceded "that he had reviewed a critique of OEQ's methodology from the publishers of a competitor vocational resource," SkillTRAN, and that SkillTRAN's critique "had led him to consider abandoning OEQ." (ECF No. 19 at 8 (citing Tr. 934).) While conceding that the OEQ's "methodology for developing [job] numbers … [is] not a perfect science," the VE opined that "it's about as a good of a science as we can get." (Tr. 934.)

At the close of the VE's testimony the ALJ asked the VE for the basis behind his testimony. (Tr. 934.) The VE responded that it was "[b]ased on [his] education, [his] skills

and training background and [his] work over the past 21 years." (Tr. 934.) The ALJ asked Townsend's counsel whether he intended to file "a post hearing brief" and whether she should "hold the record open" for such a filing. (Tr. 935.) Townsend's counsel responded that he did not think it was necessary unless the ALJ wanted more detail about a regulation he raised in his opening statement. (Tr. 935.) The referred-to regulation concerned an agency directive that ALJs, before rejecting any consultative examiner's opinion as inadequate or incomplete, make efforts to "reconnect with consultative examiners" to fill in any gaps in their opinion. (Tr. 915-16.) The ALJ confirmed that she was familiar with the regulation and her duty under it and indicated that she did not need post hearing briefing on it. (Tr. 935.) Townsend's counsel responded, "Okay. So, I think that's probably it." (Tr. 935.) Townsend's counsel did not file a post-hearing brief. (Tr. 899.)

In her step-five finding, the ALJ denied Townsend's request for the issuance of a Subpoena Duces Tecum, finding that the VE "ha[d] the requisite expertise to testify knowledgably on the relevant vocational matters." (Tr. 899.) Anticipating that Townsend would challenge on appeal the reliability of the VE's job-number estimates, the ALJ noted that Townsend's counsel "had ample opportunity to question the [VE] regarding his methodology and the accuracy of the job descriptions offered at the hearing, as well as raise any relevant objections to the [VE's] testimony in a post-hearing brief," but had "failed to submit a post-hearing brief detailing any such grievances." (Tr. 899.) Thus, the

ALJ found "that [Townsend's counsel] failed to establish that the expert's approach to estimating job numbers, including his sources and methodology, was wanting or inconsistent with Agency rules, regulations, or policy." (Tr. 900.) Finding that Townsend had forfeited any challenge to VE's testimony, the ALJ accepted the VE's testimony— including his job-number estimates—and concluded that Townsend "is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (Tr. 900.)

If an ALJ chooses to rely on testimony from a VE for her step-five finding, that testimony must be reliable: "A finding based on unreliable VE testimony is equivalent to a finding that is not supported by substantial evidence and must be vacated." *Britton v. Astrue*, 521 F.3d 799, 803 (7th Cir. 2008). "A methodology is reliable when it is based on 'well-accepted' sources and the vocational expert explains her methodology 'cogently and thoroughly.'" *Ruenger*, 23 F.4th at 763 (quoting *Biestek*, 139 S. Ct. at 1155). When the reliability of the VE's job-number estimates is challenged, the ALJ must "compel the vocational expert to offer a 'reasoned and principled' explanation of the methodology [he] used to produce the estimate." *Id.* (quoting *Chavez v. Berryhill*, 895 F.3d 962, 968 (7th Cir. 2018)).

But "[w]hen no one questions the [VE's] foundation or reasoning, an ALJ is entitled to accept the [VE's] conclusion …." *Fetting v. Kijakazi*, 62 F.4th 332, 337 (7th Cir. 2023) (quoting *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002)). "Accordingly, a

claimant who does not object to a VE's testimony during the administrative hearing forfeits those objections." *Id.* (quoting *Brown v. Colvin*, 845 F.3d 247, 254 (7th Cir. 2016)). The claimant, however, "does not need to make a formal objection"; she need "only [] cross-examine the expert and elicit statements that call into question the reliability of his conclusions." *Courtney v. Berryhill*, 385 F. Supp. 761, 763-64 (W.D. Wis. 2018) (citing *Overman v. Astrue*, 546 F.3d 456, 464-65 (7th Cir. 2008)).

Townsend's cross-examination of the VE during the hearing elicited a concession that the OEQ had used a "similar algorithm" for the past five years to generate job numbers. (Tr. 934.) The VE conceded that the methodology was "not a perfect science." (Tr. 934.) And while the VE also contended that "right now it's about as good of a science as we can get," he did not explain his basis for saying so. (Tr. 934.) In fact, when Townsend's counsel asked him whether he was aware of SkillTRAN's critique, the VE confirmed that he had read the critique and that it had led him to consider using SkillTRAN instead of OEQ for job-number estimates. (Tr. 934.) The VE did not explain why he opted to stay with OEQ.

Townsend's counsel's cross-examination of the VE elicited statements calling into question the reliability of the VE's job estimates. This was sufficient to constitute an objection to the reliability of the VE's testimony, triggering the ALJ's duty to inquire further into his methodology before accepting his job number estimates. *Cf. Courtney*, 385 F. Supp. 3d at 764 (finding that where a claimant "asked the [VE] to explain the source of

his job-number estimates," and the expert responded with "a variation of the 'equal distribution method,'" the reliability of the VE's conclusions was sufficiently called into question as to constitute an objection requiring follow up from the ALJ). While the ALJ in her step-five finding asserted that Townsend had forfeited any objection regarding the reliability of the VE's estimates because she had failed to raise the issue in a post-hearing brief (Tr. 899-900), Townsend was under no obligation to file such a brief; the ALJ had already received sufficient notice of Townsend's objection to the reliability of the VE's methodology—not only from the cross-examination during the administrative hearing, which elicited the VE's reservations about OEQ's methodology, but also from Townsend's pre-hearing motion in which Townsend requested that the ALJ provide documentation to support his methodology, signaled an intention to object to the VE's methodology, and outlined criticisms of the equal distribution methodology used by OEQ. *Compare Fetting*, 62 F.4th at 338 (finding that the claimant's prehearing brief did not constitute an objection to the VE's testimony because it "did not raise any specific concerns regarding the VE's testimony or the methodology he used" but "merely reserved the right to make objections to the VE's testimony at or after the hearing"), *with* Tr. 1137-45 (detailing the "shortcomings" of OEQ's methodology for estimating job numbers in a prehearing brief).

Townsend's principal objection to the VE's reliance on the OEQ for his job-number estimates is that OEQ employs the equal distribution method for producing job numbers.

*See Herrmann v. Colvin*, 772 F.3d 1110, 1114 (7th Cir. 2014). (ECF No. 19 at 22-23.) Under the equal distribution method, the VE

> simply divides the number of jobs in the broad category that includes the narrow category of jobs that the applicant can perform by the number of narrow *categories* in the broad category, … thus assuming that each narrow category has the same number of jobs as each other narrow category— which is preposterous. A vocational expert's stated number of jobs in a narrow category seems likely, therefore, to be a fabrication.

*Alaura v. Colvin*, 797 F.3d 503, 508 (7th Cir. 2015) (internal citation omitted) (emphasis in original). The Seventh Circuit has been highly critical of the equal distribution method over the last decade. *See, e.g.*, *Herrmann*, 772 F.3d at 1114 (describing it as "arbitrary"); *Browning v. Colvin*, 766 F.3d 702, 709 (7th Cir. 2014) (describing it as "unacceptably crude"); *Chavez v. Berryhill*, 895 F.3d 962, 966 (7th Cir. 2018) (describing it as "highly inaccurate"); *Ruenger*, 23 F.4th at 762 (describing it as "illogical[]"). And while the Seventh Circuit has "never enjoined the use of the equal distribution method, [it has] required that a [VE] justify her use of it …. by, for example, drawing on her past experiences with the method or knowledge of job markets." *Ruenger*, 23 F.4th at 764 (citing *Chavez*, 895 F.3d at 969).

The Commissioner argues that the vocational expert's "testimony cleared the substantial evidence bar, and the ALJ reasonably relied upon the … testimony to find that work existed for [Townsend]." (ECF No. 29 at 24.)  She points out that the VE "holds a master's degree in rehabilitation psychology," that he "grounded his estimates in his specialized knowledge of the labor market that he developed by placing individuals in

jobs," and that, "[d]uring the hearing, [he] repeatedly referenced his experience, noting that he had worked in the field for over two decades." (ECF No. 29 at 2224 (citing Tr. 931-33, 934, 1231-32).)

However, with the reliability of the VE's job-number estimates sufficiently raised by Townsend, at a minimum the ALJ needed to ask the VE about the methodology behind his job-number estimates before she relied on those estimates in her final decision. Because the ALJ failed to do so (Tr. 930-35), her step-five finding lacks substantial evidence. Remand is therefore necessary for the ALJ to inquire into the VE's methods, determine whether those methods are reliable and whether they were accurately applied to Townsend's case.

## 5. Conclusion

In assessing Dr. Pushkash's opinion that Townsend's ability to concentrate and persist on tasks in a work setting is likely to be moderately or severely impaired due to the interfering effects of her anxiety, the ALJ impermissibly played doctor when determining that the opinion was not supported by the results of Dr. Pushkash's own examination. As such, on remand the ALJ must reassess the supportability of Pushkash's opinion.

The ALJ dismissed Dr. Verwert's opinion that Townsend's "underlying anger, inattention, and suspicion of others" impacts her ability to concentrate and causes an inability "to maintain the pace needed" in a work setting, in part, because it was

inconsistent with Townsend's activities of daily living. But because the ALJ did not identify any particular activity as inconsistent with Verwert's opinion, remand is necessary so that the ALJ can explain which of Townsend's daily activities conflict with Verwert's opinion and how she reached that conclusion. The ALJ also erred in finding that Townsend's "irregular pursuit of treatment" undercut Verwert's opinion about her concentration/pace deficits, without first asking Townsend at the administrative hearings why she periodically failed to pursue mental health treatment. On remand, the ALJ must inquire as to Townsend's reasons for her lack of mental health treatment if she is to again use a lack of such treatment as reason to discount Verwert's opinion.

Finally, because Townsend called into question the reliability of the methodology behind the VE's job-number estimates, it was incumbent upon the ALJ to ensure that the estimates were premised on a sound methodology. But because the ALJ failed to ask the VE any questions about his methodology, her step-five finding lacks substantial evidence, and remand is necessary so that she can inquire into the VE's methods, find out whether those methods are reliable, and whether they were accurately applied.

**IT IS THEREFORE ORDERED** that the Commissioner's decision is **vacated**, and pursuant to 42 U.S.C. § 405(g), sentence four, this matter is **remanded** for further rulings consistent with this decision. The Clerk shall enter judgment accordingly.

**IT IS FURTHER ORDERED** that the plaintiff's motion for leave to file supplemental authority (ECF No. 36) is **denied as moot**.

Case 2:22-cv-00165-WED   Filed 04/20/23   Page 30 of 31   Document 39

Dated at Milwaukee, Wisconsin this 20th day of April, 2023.

WILLIAM E. DUFFIN
U.S. Magistrate Judge